FANNIE SLATINKA, Administratrix, Appellee, v. UNITED STATES RAILWAY ADMINISTRATION et al., Appellants.

**COMMERCE:**  Federal Employers' Liability Act—Preparing Coal.  A
1   railway employee is engaged in interstate commerce when, at the time of injury, he is engaged at a coaling station in breaking coal to the proper size for immediate storage in said station, at which both intrastate and interstate engines were supplied with coal.

**NEW TRIAL:**  Verdict—Excessiveness—$12,000.  Verdict under Fed-
2   eral Employers' Liability Act for $12,000 for fatal personal injury reviewed, and held nonexcessive, especially so in view of the fact that it may have embraced an allowance for the pain and suffering of the deceased.

*Appeal from Benton District Court.*—JAMES W. WILLETT, Judge.

MAY 9, 1922.

REHEARING DENIED SEPTEMBER 23, 1922.

ACTION at law for damages for injury to plaintiff's intestate, who was an employee of the Chicago, Rock Island & Pacific Railway Company. At the time of the injury, the railroad was being operated by the United States Railway Administration. Verdict for plaintiff, and the defendant appeals.—*Affirmed.*

*J. G. Gamble, R. L. Read,* and *G. W. Burnham,* for appellants.

*Thomas & Thomas* and *Nichols & Nichols,* for appellee.

FAVILLE, J.—The Chicago, Rock Island & Pacific Railway Company operates a line of railroad extending from Chicago to certain points in Minnesota and South Dakota, and passing through the town of Traer, in Tama County, Iowa. At said town of Traer, the railway company has established a coaling station, for the purpose of supplying coal to engines operated on said railway. This is arranged in such a way that the cars that are filled with coal are placed over a pit which is practically 20 feet long and 15 feet wide, and the sides of which slope to a point at the bottom. When a car is placed over this pit for unloading, a lever is operated on the car, which permits the hoppers in the bottom of the car to fall down and drop the coal from the car into the pit. There is an iron grate over the pit; and when the coal is dumped from the car in the manner described, it falls on this grate, which catches and holds the larger lumps of coal. After the coal passes through the grate into the pit, it is elevated into the storage bins by a bucket operated by a gasoline engine. It is thereafter drawn from the storage bins as needed, by a form of conveyor which carries the coal from the bin to the tender of the engine. The capacity of the coaling station is about 80 tons, and during the wintertime, about 1,800 tons of coal are handled each month at the station.

Appellee's intestate was employed as an assistant or helper to the man in charge of this coaling station. The general nature of his business was that of moving cars, dumping the coal into the coal pit, breaking up the large lumps of coal that lodged on the grate, winding up the dumps or hoppers on the cars, clean-

*1. COMMERCE: Federal Employers' Liability Act: preparing coal.*

ing up the scattered coal, and in general doing the necessary
things in connection with the unloading of coal from the cars
in which it had been transported and the delivery of the same
into the storage bins, from which it was subsequently placed
in the tenders of the engines as needed.  The work of delivering
the coal from the storage bin to the tender of an engine is by
means of a conveyor, and is done by the fireman of the engine
receiving the coal.  It appears from the evidence that a car-
load of coal will not always go into the pit, and also that, when
coal becomes lodged on the grate, it is necessary for an employee
to go upon the grate and break the coal into smaller lumps, so
it will pass through the grate into the pit.  The appellee's
intestate usually did this work.  At the time of the injury, a
freight train was switching in the yards.  A coal car had been
placed over the pit, and appellee's intestate was engaged in the
work of breaking the lumps of coal lodged on the grate, when
the car was moved by the freight engine, and the intestate re-
ceived the injury which resulted in his death, a few hours later.
The testimony showed that the engines of trains engaged in both
interstate and intrastate commerce regularly received coal at
this station.  The uncontradicted evidence established the fore-
going state of facts.

I.  Appellee's action was brought under the Federal Em-
ployers' Liability Act (U. S. Compiled Statutes, Sections 8657
to 8665) ; and it is the appellant's contention that the decedent
was not engaged in interstate commerce at the time of his in-
jury, and that the appellant is not liable under the said act.  The
question of whether an employee of a railroad company that
carries on both interstate and intrastate commerce is, by virtue
of the character of his particular employment, engaged in in-
terstate commerce at the time of an injury, has often been before
the courts, both Federal and state.  The general rule on this
subject is that, in order for an employee to come within the
terms and provisions of the Federal act, he must, at the time
of the injury, be engaged in interstate transportation, or in work
so closely related to it as to be practically a part of it.  This
general rule has been announced by the Supreme Court of the
United States and by this court.  *Pedersen v. Delaware, L. &
W. R. Co.,* 229 U. S. 146; *Shanks v. Delaware, L. & W. R. Co.,*

239 U. S. 556. The difficulty lies in the application of this general rule to the facts of any particular case. The authorities are not in harmony, nor are they consistent. We shall review a few of them, as illustrating the holdings of the courts.

The leading Federal case on the subject, and the one referred to in nearly every decision, state or Federal, that has passed upon the question, is *Pedersen v. Delaware, L. & W. R. Co.*, supra. The case was decided in May, 1913, by a divided court. The plaintiff in said action was engaged in repairing a bridge over which defendant's trains passed in both interstate and intrastate commerce. While carrying a sack of bolts to the bridge, he was injured by a train. The court said:

"We are of opinion that the work of keeping such instrumentalities in a proper state of repair while thus used is so closely related to such [interstate] commerce as to be, in practice and legal contemplation, a part of it."

In *Norfolk & W. R. Co. v. Earnest*, 229 U. S. 114, the plaintiff was engaged in piloting a locomotive through several switches to a main track, where it was to be attached to an interstate train, and was held to be engaged in interstate commerce.

In *St. Louis, S. F. & T. R. Co. v. Seale*, 229 U. S. 156, the plaintiff's intestate was a clerk, on his way through a railroad yard to meet an inbound interstate freight train and to mark the cars so that the switching crew would know what to do with them when breaking up the train, and while so doing was injured. He was held to be engaged in interstate commerce.

In *North Carolina R. Co. v. Zachary*, 232 U. S. 248, it was held that a fireman, in inspecting, oiling, firing, and preparing an engine, was performing acts as a part of interstate commerce, although the train to be drawn by the engine, containing the cars to be moved in interstate commerce, had not yet been coupled up.

In *Delaware, L. & W. R. Co. v. Yurkonis*, 238 U. S. 439, it appeared that the railroad company owned a coal mine. Plaintiff was employed as a miner, and was injured while at work in the mine. The coal was used in interstate commerce. The court said:

"The mere fact that the coal might be or was intended to be used in the conduct of interstate commerce after the same

was mined and transported did not make the injury one received by the plaintiff while he was engaged in interstate commerce.''

In Chicago, B. & Q. R. Co. v. Harrington, 241 U. S. 177, a switching crew was engaged in switching coal which had been standing on a storage track for a week or more, to a coal shed where it was to be placed in bins and supplied as needed for engines engaged in both kinds of traffic. Plaintiff's duty ''was solely in connection with the removal of the coal from the storage tracks to the coal shed,'' and it was held that plaintiff was not engaged in interstate commerce.

In Shanks v. Delaware, L. & W. R. Co., supra, the plaintiff was employed in a machine shop for the repairing of locomotives. On the day of the injury, he was engaged solely in taking down and putting into a new location an overhead countershaft, a heavy shop fixture, through which power was communicated to some of the machinery used in repair work. He was held not to be engaged in interstate commerce, and the court said:

''The true test of employment in such commerce in the sense intended is, Was the employee, at the time of the injury, engaged in interstate transportation or in work so closely related to it as to be practically a part of it?''

In Minneapolis & St. L. R. Co. v. Winters, 242 U. S. 353, the plaintiff was making repairs upon an engine which had been used in hauling freight trains in both interstate and intrastate commerce. The last two times, the engine had been used in intrastate commerce. It was held that an engine is not permanently devoted to any kind of traffic, and it did not appear that it was destined to anything more definite than such business as it might be needed for. This was insufficient to show that the plaintiff was engaged in interstate commerce.

In Lehigh Valley R. Co. v. Barlow, 244 U. S. 183, the plaintiff was a member of a switching crew, and was assisting in placing cars containing supply coal for the railroad, on an unloading trestle within its yards. The cars had been brought from without the state, and had remained upon the sidings and switches from seventeen to twenty-four days, before being removed to the trestle. It was held that the switching crew was not engaged in interstate commerce.

In Philadelphia, B. & W. R. Co. v. Smith, 250 U. S. 101,

an employee of an interstate railroad was employed to cook for
a gang of bridge carpenters, and was injured while in a car on
a sidetrack, in the performance of his duties. He was held to
be engaged in interstate commerce, within the meaning of the
Federal Employers' Liability Act.

In *Erie R. Co. v. Collins*, 253 U. S. 77, the plaintiff operated
a signal tower and water tank, the tower being used for the
operation of trains in interstate and intrastate commerce. The
tank was used for supplying locomotives with water, which was
pumped from a well into the tank by a gasoline engine, which
engine was operated by the plaintiff. While engaged in this
service, he was injured. The court reviewed the Federal cases
at length, and said:

"Plaintiff was assigned to duty in the signal tower and in
the pump house, and it was discharged in both on interstate
commerce as well as on intrastate commerce, and there was no
interval between the commerces that separated the duty, and it
comes, therefore, within the indicated test. It may be said,
however, that this case is concerned exclusively with what was
to be done, and was done, at the pump house. This may be true,
but his duty there was performed and the instruments and
facilities of it were kept in readiness for use and were used on
both commerces as was demanded, and the test of the cases
satisfied."

In *Erie R. Co. v. Szary*, 253 U. S. 86, the plaintiff was em-
ployed in what is called the "sand house," a small structure
which was standing in the yards of the railroad company near
the track, and in which sand was dried for use in engines. The
drying was done in large stoves, which it was plaintiff's duty
to attend. The ashes were carried from these stoves and dumped
in the ash pit; and while he was engaged in this work, plaintiff
was injured. Referring to the distinctions attempted to be made
between the service rendered in interstate and intrastate com-
merce, the court said:

"The distinctions are too artificial for acceptance. The
acts of service were too intimately related and too necessary for
the final purpose to be distinguished in legal character."

In *Philadelphia & R. R. Co. v. Di Donato*, 256 U. S. 327
(41 Sup. Ct. Rep. 516), the court said:

"Di Donato was employed by the company as a flagman at a public crossing, to signal both intrastate and interstate trains. In other words, his employment concerned both kinds of trains, without distinction between them or character of service. He was an instrument of safety for the conduct of both. And in the course of his employment he was killed by a train, whose character is not disclosed. * * * The service of a flagman concerns the safety of both commerces, and to separate his duties by moments of time or particular incidents of its exertion would be to destroy its unity and commit it to confusing controversies."

The foregoing cases illustrate the holdings of the Supreme Court of the United States under a variety of circumstances. Some of these cases are cited by each of the parties hereto, as sustaining their respective contentions. We will consider a few of the many other cases that have involved the question, under circumstances somewhat analogous to those in the case at bar.

*Kelly v. Pennsylvania R. Co.,* 238 Fed. 95, was decided by the Circuit Court of Appeals of the third circuit. The decedent was a foreman of carpenters, and was engaged in making repairs on coal chutes that were used for both kinds of commerce, interstate and intrastate. At the time of the injury, he was in the yards of the company, attending to the moving of a carload of lumber to the place where the repairs were to be made. It was held that this work was not so closely related to interstate commerce as to be practically a part of it, and that plaintiff did not come under the provisions of the act.

. In *Southern R. Co. v. Pitchford,* 253 Fed. 736, decided by the Circuit Court of Appeals of the fourth circuit, the plaintiff was employed as a car cleaner in the defendant's yards, his duty being to clean the yard of papers and other refuse, and clean and ice cars, both interstate and intrastate. While engaged in getting ice in the yards, he was struck by a switch engine. The court said:

"He had entered upon the work of receiving ice from the chute and transporting it to an ice box. This work was too remote from interstate commerce to be regarded a part of it."

The case was decided by a divided court.

In *Kozimko v. Hines,* 268 Fed. 507, the Circuit Court of Appeals of the third circuit reviewed the authorities, in a case

where the decedent had been employed at night to keep fires used in operating a crane that was used to unload coal from cars to the ground in the storage yards. This coal was to be used to accumulate a reserve supply of coal, in view of a threatened strike, and 'for any purpose for which coal was needed in the operation of the railroad. The nearest coaling station to this storage pile was about one and a half miles distant, and the coaling station was used to coal engines in interstate and intrastate commerce. The accident occurred about seven miles from the place where the decedent worked. He was injured in going to the station to take a train to the place of his employment, and it was held that he was not engaged in interstate commerce. The court said:

"We cannot regard the storing of coal against the two contingencies we have named as being so certainly and so closely related to the interstate commerce that might follow 'as to be practically a part of it.' "

In *Capps v. Atlantic Coast Line R. Co.*, 178 N. C. 558 (101 S. E. 216), a carpenter engaged in repairing a coal chute from which coal was delivered to trains engaged in interstate commerce was held not to be employed in interstate commerce. After reviewing the decisions, the court held that the making of repairs on a structure where coal is stored for the purpose of being supplied to an engine, as called for, is not such an act as brings the employee within the provisions of the Federal statute, "the same being too remote."

In *Gallagher v. New York Cent. R. Co.*, 180 App. Div. 88 (167 N. Y. Supp. 480), decided by a divided court, deceased was a carpenter in the general employ of defendant company, and at the time of his death, was repairing coal pockets in a coaling station on a sidetrack. Coal from the pockets was used in both interstate and intrastate commerce. It was held that the employee did not come under the Federal act.

In the case of *Hines v. Baechtel*, 137 Md. 513 (113 Atl. 126), the Court of Appeals of Maryland reviewed the authorities. The employee was engaged at an engine house, as janitor, "handy man," storekeeper, and clerk, and was struck by a locomotive, while he was crossing the railroad tracks in the act

of carrying papers from the engine house to the telegraph office. The court said:

"It is evident that the service of a messenger who carried coal reports to a railway telegraph office is much more remote from the operation of the trains than is that of the employee who moves the coal itself to a position from which it can be supplied to the locomotives."

Other cases of like tenor could be cited.

Let us examine some of the cases that reach an opposite conclusion under somewhat similar facts.

In *Horton v. Oregon-Wash. R. & N. Co.*, 72 Wash. 503 (130 Pac. 897), the court said:

"That the decedent was employed by the defendant as a pumper at Onyx, Idaho, and operated at that place a pumping plant for the purpose of supplying the locomotives of the defendant with water; that decedent lived two or three miles from the pumping plant, and that it was necessary for him to go to the plant daily; that for this purpose defendant furnished him with a small handcar, called a 'speeder;' that, on October 8, 1910, while going from his home to the pumping plant, and while operating the speeder on the track of the defendant, decedent was overtaken by an interstate passenger train."

It was held that he came within the Liability Act.

In *Southern R. Co. v. Peters*, 194 Ala. 94 (69 So. 611), it is held that one engaged in delivering coal to a chute to be later used in coaling both interstate and intrastate engines is engaged in interstate commerce, within the meaning of the act.

In *Barlow v. Lehigh Valley R. Co.*, 158 App. Div. 768 (143 N. Y. Supp. 1053), plaintiff was an engineer on a switch engine, and engaged in switching coal cars to a coaling station, where the coal was dumped into coal pockets from which it was afterwards discharged through chutes into the tenders of locomotives, part of which were engaged in interstate and part in intrastate commerce. The court said:

"Depositing the coal in the pockets was one step toward placing it in the tenders of the locomotives."

It was held that the employee came under the Federal Act.

In *Chicago, R. I. & P. R. Co. v. Bond*, 47 Okla. 161 (148 Pac. 103), it appeared that it was the duty of the deceased to

order coal for chutes, and when cars were placed, to unload them
into chutes, and from there into the tenders of engines engaged
in both kinds of commerce. It was his duty to make and deliver
tickets of the amounts of coal unloaded, and he was killed while
in the yard, taking tickets to the depot; and it was held that
he was engaged in interstate commerce, within the meaning of
the Liability Act.

In *Kelly v. Erie R. Co.,* 188 App. Div. 863 (177 N. Y. Supp.
278), the railroad company had a pumping station. The water
was pumped by a gasoline engine from a river into an elevated
tank. Plaintiff was engaged in oiling a shaft used in connec-
tion with the pumping, and was injured. It was held that the
employee was engaged in interstate commerce.

In *Guy v. Cincinnati N. R. Co.,* 198 Mich. 140 (166 N. W.
667), the injured employee was engaged in providing coal and
water for locomotives which were engaged in moving trains in
interstate commerce. He was injured while at work on the
elevator at the coaling station, and it was held that he was en-
gaged in interstate commerce.

In *Gruszewsky v. Director General of Railroads,* 96 Conn.
119 (113 Atl. 160), from the Court of Errors of Connecticut, it
appeared that the railroad company maintained in its yards
adjoining its tracks a heating plant, in which steam was gen-
erated and transmitted through pipes to cars standing on the
tracks. The steam so generated was used in both interstate and
intrastate commerce. The deceased employee operated the boiler
of the heating plant, and brought the coal to the boiler from
coal cars standing on the track near the boiler house. He con-
tracted pneumonia, which was caused by the conditions under
which he worked in the activities of his employment. The court
reviewed the authorities, and held that the decedent was en-
gaged in interstate commerce, and came within the purview of
the Federal Employers' Liability Act.

In *Roush v. Baltimore & O. R. Co.,* 243 Fed. 712, the plain-
tiff alleged that he was employed in a pump house that pumped
water for the supply of engines that were engaged in interstate
and intrastate commerce. He removed the hatch of the cistern,
to ascertain the depth of water, and was injured by an explo-
sion of gas that had accumulated in the cistern. The court re-

viewed the authorities, recognized the conflict therein, and held that the plaintiff was engaged in interstate commerce.

In *Kamboris v. Oregon-Wash. R. & N. Co.*, 75 Ore. 358 (146 Pac. 1097), there was much the same arrangement as to the chute as in the instant case. Deceased was employed in unloading coal cars. The coal was placed in the pockets of the chute, to be available for coaling engines. It was emptied into tenders by other employees. The court said:

"In the case at bar, we cannot see why the act of furnishing the coal for fuel and placing the same in the pockets of the chute, to be used partly in the engines engaged in interstate traffic, was not just as essential in the matter of running interstate trains as the act of taking the same out of such chute or pockets and placing it upon the tenders of the engines, or any other act of the employees in running the engines and trains transporting such commodities."

In *Sells v. Grand Trunk W. R. Co.*, 206 Ill. App. 45, the plaintiff was an engineer at the coal dock operated by the railroad. The coal was hoisted into a chute from which the tenders of the engines were filled. The railroad company was engaged in both interstate and intrastate commerce. The court held that the business of the plaintiff was the operation of the instrumentality which actually loaded the defendant's interstate commerce engines with fuel, and that he was injured while repairing that instrumentality, and came under the Federal act.

The foregoing cases illustrate the holdings of the courts under conditions that are more or less analogous to the situation in the instant case.

We have had the question of liability under the Federal act before us under various conditions. In *Armbruster v. Chicago, R. I. & P. R. Co.*, 166 Iowa 155, the injured party was employed as a hostler's helper. The hostler brought an engine with a tender attached from the roundhouse to the coal chute. The decedent, as a part of his duties, pulled the apron or conveyor down by seizing a chain, and the coal poured from the bin over it into the tender. The decedent then pushed the apron or conveyor up, and it fell back, striking him and causing the injury complained of. The engine in question was used in transporting a train in interstate commerce. We reviewed a

number of the Federal authorities, and held that the deceased was employed in interstate commerce at the time of receiving the injury, within the meaning of the Federal Liability Act.

In *Ross v. Sheldon*, 176 Iowa 618, the injured party was a lineman, employed on an interurban electric line extending from Des Moines to Fort Dodge, within this state, which road, by means of connection with other lines of railway, did a large amount of interstate business. Along the railway track was its line of poles, carrying cross-arms upon which were various wires, including a telegraph, block signal, power and feed wires. The decedent was engaged in putting cross-arms upon these poles in connection with the automatic signal service system. While at work in nailing cross-arms upon a pole, he was killed by contact with some of the wires upon other cross-arms. It was contended that the particular work in which he was engaged was not repair or maintenance work, but was construction work. We held that the distinction between such forms of work must not be drawn too fine, and that the decedent was engaged in interstate commerce.

In *Brier v. Chicago, R. I. & P. R. Co.*, 183 Iowa 1212, it appeared that the plaintiff was employed as a lineman, to repair telegraph lines along and on the right of way of the railroad company, which lines were used in the operation of interstate trains. The plaintiff, at the time of the injury, was on his way to a certain point where he was to assist in straightening some telegraph poles, and received the injury while so en route. We held that the plaintiff was engaged in interstate commerce.

In *Reed v. Dickinson*, 184 Iowa 1363, the plaintiff was engaged in helping remove steel rails from a flat car. The rails so unloaded were being used in the repair of the railroad track which was used for the transportation of interstate trains. We held that the work was so closely related to interstate transportation as to be practically a part of it.

In *Eley v. Chicago G. W. R. Co.*, 186 Iowa 312, the plaintiff was a conductor in charge of a work train that had been engaged in distributing ties along the line of a railway, which ties were intended to be used to repair the track over which trains ran in interstate commerce; and on the return trip from such work, he was injured. We held that the injured party was engaged in

work so closely related to interstate commerce as to be a part thereof.

The same rule is announced, under a somewhat similar state of facts, in *Lammars v. Chicago G. W. R. Co.*, 187 Iowa 1277.

In *Smith v. Interurban R. Co.*, 186 Iowa 1045, a conductor on an interurban was injured. The railway was located wholly within the state. The decedent had just completed a trip in which a car had been moved in interstate commerce; but the car had reached its final destination, and the conductor was proceeding to place the motor in the barn when he was injured. We held that he had completed the interstate service at the time of the injury, and that the Federal act did not apply.

In *Wright v. Interurban R. Co.*, 189 Iowa 1315, the defendant operated an interurban railway within this state, which was engaged in both interstate and intrastate commerce. The plaintiff was employed in repairing a room that had formerly been occupied as a substation. It had not been used for a period of eight or nine months, but was being restored with the intention of being used in the future. We held that the plaintiff was not, at the time of his injury, engaged in interstate commerce, within the purview of the Federal Employers' Liability Act.

We again reviewed the question in *O'Neill v. Sioux City Terminal R. Co.*, 193 Iowa 41, where we held that a switchman of a terminal company engaged in switching cars from the terminal to their ultimate destination in the stockyards, part of which cars had been brought from a point outside the state, was engaged in interstate commerce.

It is impossible to harmonize all of the cases. We have reviewed a sufficient number of them to indicate the holding of the courts under various facts and conditions. Each case must, of necessity, be governed by its own particular facts, and the line of distinction between employment in interstate commerce and in intrastate commerce is not always easy of demarcation. Following our previous decisions in similar cases, and also what we believe to be the greater weight of authority, Federal and state, we are of the opinion that in the instant case the appellee's intestate, at the time of his injury, while engaged in breaking the lumps of coal upon the grate at the coaling station, which coal was to be immediately placed in bins, from which it was

taken directly and almost immediately to the tenders of engines used in interstate commerce as the same were needed in the operation of interstate trains, was engaged in work so closely related to interstate transportation as to be practically a part of it; and that, therefore, this action for damages can be maintained under the Federal Employers' Liability Act.

II. It is argued that the verdict of $12,000 is excessive.

Appellee's intestate was 29 years of age when he died, and had an expectancy of 30.20 years. His earnings at or about the time of his death were from $90 to $100 per month. He was industrious and frugal. He had purchased a lot and built a house, at a total cost of about $2,275. He had other real estate worth $400, and owed about $800. He left a widow 27 years of age, and two children, aged 7 and 4. The decedent survived the injury about eight hours, during which time he was conscious, and suffered pain. Under the Federal act, in estimating damages the jury may take into consideration the pain and suffering of decedent before his death. *Kansas City S. R. Co. v. Leslie,* 238 U. S. 599; *St. Louis, I. M. & S. R. Co. v. Craft,* 237 U. S. 648. We do not think that, under all of the circumstances disclosed in the record, the amount of the verdict indicates that it is the result of passion and prejudice. We are not disposed to interfere therewith.

The judgment of the trial court is—*Affirmed.*

STEVENS, C. J., EVANS and ARTHUR, JJ., concur.